JUDGE COTE

05 CV 8488

DAVIS & GILBERT LLP
Howard J. Rubin (HR 1768)
Scott L. Walker (SW 0330)
1740 Broadway
New York, NY 10019
(212) 468-4800
Attorneys for Plaintiff Ogilvy Group Sweden AB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| OGILVY GROUP SWEDEN AB,<br><br>    Plaintiffs,<br><br>-against-<br><br>TIGER TELEMATICS, INC., GIZMONDO EUROPE, LTD.,<br><br>    Defendants. | Civil Action No.:_____<br><br>COMPLAINT |

Plaintiff Ogilvy Group Sweden AB ("Ogilvy"), by and through its attorneys, Davis & Gilbert LLP, for its Complaint against Defendants Tiger Telematics, Inc. ("TTI") and Gizmondo Europe Limited ("Gizmondo") (collectively "Tiger"), states as follows:

## NATURE OF ACTION

1.  Ogilvy brings this action to recover approximately $4.2 million plus consequential damages, interest, and costs. Ogilvy alleges claims of breach of contract, common law fraud, and securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. All claims are related to Tiger's false representations regarding TTI's ability and intent to file and make effective a registration statement for 400,000 shares of TTI common stock (the "Securities") that were pledged to Ogilvy pursuant to a July 15, 2004 Securities Lending Agreement ("SLA") executed by Tiger and

Ogilvy. In addition, Ogilvy brings the instant claims because Tiger misrepresented its compliance with the Exchange Act and the rules of the United States Securities and Exchange Commission ("SEC") when it falsely represented to Ogilvy in the SLA: a) that TTI was, at that time, able to file the Registration Statement with the SEC and make it effective; and b) that TTI intended to file and make the Registration Statement effective immediately after executing the SLA.

        2. Tiger represented in the SLA that TTI would file with the SEC a registration statement for the Securities (the "Registration Statement") and make the Registration Statement effective for the duration of the SLA. TTI never filed the Registration Statement. Indeed, Tiger never intended that TTI would file or make effective the Registration Statement because TTI was—and would continue to be for the foreseeable future—in gross violation of its Exchange Act periodic reporting obligations under Section 13 of the Exchange Act (the "Periodic Reporting Obligations") and therefore would be unable to make effective any registration statement filed with the SEC. TTI's non-compliance with the Periodic Reporting Obligations was a material fact known to Tiger when it executed the SLA. Tiger concealed and otherwise failed to reveal TTI's non-compliance to Ogilvy, which executed the SLA in reliance on TTI's promise to file the Registration Statement and make it effective for the duration of the SLA. As a result, Ogilvy has been unable to sell the Securities via the public securities markets in accordance with its right to do so under the terms of the SLA.

## PARTIES

        3. Plaintiff Ogilvy is a company incorporated under the laws of Sweden, whose principal place of business is at Humlegårdsgatan 6, 114 80, Stockholm, Sweden.

4. Defendant Gizmondo is a company incorporated under the laws of England and Wales, whose registered office is at 1 Meadow Gate Avenue, Farnborough Business Park, Farnborough, Hampshire GU14 6FG, United Kingdom. Gizmondo is a wholly owned subsidiary of defendant TTI.

5. Defendant TTI is a company incorporated under the laws of the State of Delaware, whose principal place of business is at 10201 Centurion Parkway North, Suite 600, Jacksonville, Florida, 32256. TTI is a publicly-traded company whose shares trade under the symbol TGTL on the over-the-counter market sometimes referred to as the "pink sheets."

## JURISDICTION & VENUE

6. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1332.

7. Venue in this judicial district is proper under 28 U.S.C. § 1391(a)(3) because, in executing the SLA, Tiger consented to such jurisdiction for any disputes which "may arise out of or in connection with the [SLA]." (SLA § 12.2) (attached hereto as Exhibit ("Exh.") A))

## ALLEGATIONS COMMON TO ALL CLAIMS

8. Between 2003 and 2004, Ogilvy and Gizmondo executed two service agreements (the "Service Agreements") in which Ogilvy agreed to provide Gizmondo with certain marketing services related to Gizmondo's products and Gizmondo agreed to pay Ogilvy for those services.

9. Over time, Gizmondo became significantly indebted to Ogilvy due to its failure to make timely payments to Ogilvy under the terms of the Service Agreements.

10. Prior to executing the SLA, Gizmondo promised Ogilvy on multiple occasions that it would make payments for the significant amounts in arrears under the Service Agreements. Gizmondo repeatedly failed to make good on these promises.

11. On April 26, 2004, April 30, 2004, and May 5, 2004, TTI represented in public filings made with the SEC that—as of those dates—TTI "**ha[d] filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months**." (Exh. B, attached hereto (collecting three Forms 10-Q filed by TTI) (emphasis added))

12. As of July 14, 2004 Gizmondo owed Ogilvy approximately $1 million under the Service Agreements.

13. At or about the time the SLA was signed in July 2004, Gizmondo promised Ogilvy that by the fall of 2004, Gizmondo would make payment to Ogilvy of all amounts in arrears under the Service Agreements, including but not limited to amounts due and owing to Ogilvy prior to execution of the SLA.

14. The SLA was negotiated in or around July 2004 via telephone calls, electronic mail ("email") communications, and in-person meetings that included Lars Blomberg (Ogilvy's then-CEO), Martin Forsman (Ogilvy's then-CFO), Carl Freer (TTI's founder and Chairman/Managing Director of Gizmondo), Michael Carrender (TTI's CEO), and Joseph Marten (Gizmondo's then-Head of Investor Relations). During the time they were negotiating the SLA, Messrs. Blomberg and Forsman maintained offices at Ogilvy's offices in Stockholm, Sweden. Upon information and belief, during the time they were negotiating the SLA, Mr. Carrender maintained an office in Jacksonville, Florida, Mr. Freer maintained an office in London, England, and Mr. Marten maintained an office in London, England.

4

15. On or about July 15, 2004—less than two months after TTI represented to the SEC that it was current in its Periodic Reporting Obligations—Ogilvy, TTI and Gizmondo executed the SLA "in order to provide security to Ogilvy for [any] monies that m[ight] become due to it pursuant to the [Service] Agreements." (SLA, p. 1) Tiger provided that "security" by agreeing to lend Ogilvy the Securities, subject to the terms of the SLA. Pursuant to a reverse stock split of 25 to 1 in late July 2004, the Securities consist of 400,000 TTI shares rather than the ten (10) million shares initially pledged.

16. Messrs. Carrender and Marten signed the SLA on behalf of TTI and Gizmondo, respectively. Mr. Forsman signed the SLA on behalf of Ogilvy.

17. The SLA provides, in sum and substance, that if Gizmondo defaults on its payment obligations under the Service Agreements, Ogilvy has the right to sell as many of the Securities as necessary to fully compensate Ogilvy for the amount then in default. (SLA § 4.2)

18. In the SLA, defendant TTI specifically warranted that "no consent, approval, authorization or order of, or qualification or filing with, any governmental body or agency [wa]s required for the performance by [TTI] of its obligations under the [SLA]." (*Id.* at Annex II, § 1)

19. TTI further represented that "it w[ould] prepare and file with the SEC a registration statement with respect to . . . the Securities . . . and use its best efforts to cause such registration statement to become and remain effective *__for the duration of__* th[e] [SLA]." (*Id.* at Annex II, § 6 (emphasis added))

20. TTI promised it would "furnish to Ogilvy . . . copies of the Registration Statement" that—per TTI's representations in the SLA—was supposed to have been filed and "effective for the duration of th[at] Agreement." (*Id.* at Annex II, §§, 6, 8)

21. TTI represented that it would "take such . . . actions as [we]re reasonably required in order to expedite or facilitate the disposition of the [Securities]." (*Id.* at Annex II, § 10)

22. Tiger further represented that it would "notify Ogilvy forthwith if . . . any of the representations, warranties, undertakings or agreements set out in Annex II or Annex III hereto, cease[d] to be true and accurate or bec[a]me[] misleading in any respect." (*Id.* at § 6.2)

23. Tiger also promised it would notify Ogilvy if "there [was] any breach of any [of the] representations, warranties, undertakings or agreements" in Annexes II and III to the SLA. (*Id.*)

24. On or about October 19, 2004—after further failures by Gizmondo to make good on its promise to make payments for the substantial amounts in arrears under the Service Agreements—Tiger promised Ogilvy, via an electronic mail message from Carl Freer, that by December 15, 2004, that payments would be made to Ogilvy to bring Gizmondo current on all time billed through October 31, 2004. Tiger failed to fulfill this promise, and on or about December 16, 2004 Gizmondo still owed Ogilvy approximately $3.8 million.

25. In or around December 2004 and January 2005, Lars Blomberg approached Carl Freer of Tiger regarding the possibility of executing a new agreement (the "New Agreement") similar to the SLA, that—if executed—would have given Ogilvy additional security for the multi-million dollar debt Gizmondo had accumulated under the Service Agreements.

26. Thereafter, Tiger failed to negotiate with Ogilvy in good faith regarding the New Agreement, and it was never executed.

27. During 2005, Tiger repeatedly requested that Ogilvy not sell the Securities on its own via the private securities markets, citing concern regarding the effects that a private sale by Ogilvy would have on the overall market for TTI's securities.

28. On multiple occasions in 2005, Tiger indicated that it would rather that Tiger itself facilitate a private sale of an appropriate amount of the Securities, the proceeds of which would be applied against the substantial monies Gizmondo owed Ogilvy. In or around April 2005, Ogilvy responded that such a sale would be acceptable under certain specified conditions. At all relevant times, Tiger failed to follow-through on its offer to facilitate a sale of the Securities. To date no such sale has occurred.

29. At the request of Ogilvy, on or about May 25, 2005 representatives of Merrill Lynch contacted representatives of Tiger to inquire regarding the possibility of Ogilvy disposing of the Securities via a private sale. At that time, Tiger informed Merrill Lynch that there were still restrictions on the Securities that continued to limit severely the means by which Ogilvy could dispose of them.

30. Due to the nature of private sales of unregistered securities, any sale by Ogilvy of the Securities via a private transaction would occur at a fraction of the Securities' face-value.

31. Through the end of June 2005, Tiger continued to assure Ogilvy that Gizmondo would make cash payments to cover the debt Gizmondo had accumulated under the Service Agreements. Tiger continually failed to make good on these assurances, even bouncing a check for £133,000 (approximately $239,000) delivered to Ogilvy on or about June 28, 2005.

32. On or about June 30, 2005, Gizmondo purported to terminate Ogilvy as one of its marketing services providers. At that time, Gizmondo owed Ogilvy approximately

7

$4.2 million under the Service Agreements, together with additional amounts owed under a separate service agreement executed by Ogilvy and Gizmondo on or around April 27, 2005 (the "2005 Service Agreement").

33. The SLA terminated no later than June 30, 2005 (*i.e.*, the SLA's "Long-Stop Termination Date"). (SLA § 1 & Annex I)

34. At no time between July 15, 2004 and June 30, 2005 (the "SLA Term") did defendant TTI file the Registration Statement.

35. At no time during the SLA Term did TTI use its best efforts to cause the Registration Statement to become and remain effective.

36. At no time during the SLA Term did TTI furnish Ogilvy with copies of the Registration Statement.

37. At no time during the SLA Term did TTI take any other necessary steps, to "facilitate the disposition" of the Securities via the public securities markets. (SLA, Annex II, § 10)

38. At no time prior to executing the SLA and continuing through approximately the end of December 2004, did Tiger contact Ogilvy to inform it that TTI was in default of its Periodic Reporting Obligations.

39. From at least July 15, 2004 through the present, defendant TTI has been in violation of its Periodic Reporting Obligations (*i.e.*, the periodic reports required by Section 13 of the Exchange Act, 15 U.S.C. § 78m).

40. On or about March 31, 2005, TTI filed with the SEC a Form 12b-25 stating, *inter alia*, that "[u]ntil late 2004, [TTI] did not have sufficient cash to retain and pay independent certified public accountants to audit its financial statements and as a result did not

until March 31, 2005 file audited financial statements for the years ended December 31, 2002 and 2003." In that same filing, TTI stated it had just filed its 2002 and 2003 Forms 10-K and would be "concentrating its efforts on completing its financial statements for 2004."

41. As of October 3, 2005, TTI had not yet filed any periodic reports for fiscal year 2005.

42. During the SLA Term, there were multiple "Payment Default[s]," as that term is defined in Section 1 of the SLA.

43. The Payment Defaults triggered Ogilvy's right to dispose of certain of the Securities under Section 4.2 of the SLA.

44. Due to Tiger's failure to file the Registration Statement and make it effective, Ogilvy has been unable to exercise its right to dispose of certain of the Securities via the public securities markets.

45. Ogilvy executed the SLA in reliance on, among other things, TTI's warranty that as of July 15, 2004, no "filing with[] any governmental body"—including the SEC—"[wa]s required for the performance by [TTI] of its obligations under th[e] [SLA]." (SLA at Annex II, § 1)

46. But for TTI's concealment of its non-compliance with its Periodic Reporting Obligations, Ogilvy would not have executed the SLA.

47. The parties to the SLA contemplated the possibility of multiple "Payment Default[s]" by Gizmondo under the Service Agreements. *See* SLA § 1 (defining "Payment Default" and other terms used in the SLA). Accordingly, the SLA provided that Ogilvy could sell as many of the Securities as necessary for Ogilvy to generate cash sufficient to cover the amount by which Gizmondo was in arrears at the time of a particular Payment Default. (SLA §

9

4.2) The number of shares to be sold via this mechanism would vary based on the closing price of the Securities as quoted on the relevant securities exchange on any given "Payment Default Date." (*Id.* at §§ 1, 4.2) The SLA was thus designed to allow Ogilvy to sell some—if not all—of the Securities in the public securities markets immediately after a Payment Default by Gizmondo. (*Id.* at § 4.2)

48. Ogilvy relied on the liquidity of the Securities when it executed the SLA. Ogilvy would not have executed the SLA had Ogilvy been aware that it would be unable to sell the appropriate amount of the Securities in the public securities markets immediately after a Payment Default by Gizmondo—as was Ogilvy's contractual right under Section 4.2 of the SLA. (*Id.* at §§ 1, § 4.2)

49. TTI's noncompliance with its Periodic Reporting Obligations was a material fact known to Tiger when it executed the SLA.

50. TTI's inability to file the Registration Statement and make it effective was a material fact known to Tiger when it executed the SLA.

51. At no time prior to or during the negotiation of the SLA in July 2004 did any representative of Tiger—including Carl Freer, Michael Carrender or Joseph Marten—notify Ogilvy that TTI had failed to fulfill its Periodic Reporting Obligations and was therefore unable to fulfill its obligations to file the Registration Statement and make it effective for the duration of the SLA Term.

52. At all times before and during the SLA Term, Ogilvy fully performed for Gizmondo the marketing services specified in the Service Agreements and the 2005 Service Agreement.

## FIRST CLAIM

## BREACH OF CONTRACT

53.     Ogilvy hereby realleges and incorporates by reference paragraphs 1 through 52 of the Complaint as if fully set forth herein.

54.     The SLA set forth between the parties, and the consideration given, was fair and reasonable and created a valid and enforceable contract.

55.     Ogilvy duly performed all of the terms, conditions, covenants, promises, and duties it was obligated to perform under the SLA.

56.     In breach of the SLA, Tiger failed:

(i)     to file or make effective the Registration Statement for the duration of the SLA Term;

(ii)    to furnish Ogilvy with copies of the Registration Statement;

(iii)   to enter into any agreements, or take any other necessary steps, to "facilitate the disposition" of the Securities;

(iv)    to inform Ogilvy that Tiger was in default of its Periodic Reporting Obligations and had not filed the Registration Statement or made it effective; and

(v)     to otherwise notify Ogilvy that certain of Tiger's "representations, warranties, undertakings [and] agreements set out in [the SLA] . . . [had] cease[d] to be true and accurate [and had] become misleading [and] that there ha[d] been . . . breach[es] of . . . such representations, warranties, undertakings [and] agreements." (SLA § 6.2)

57.     Had Tiger not breached the SLA, Ogilvy would have been able to sell certain of the Securities through the public securities markets immediately upon the occurrence of a Payment Default.

11

58. As a result of Tiger's breaches of the SLA, Ogilvy has sustained damages in an amount to be determined at trial, but not less than $4.2 million, plus consequential damages and interest.

## SECOND CLAIM

## COMMON LAW FRAUD

59. Ogilvy hereby realleges and incorporates by reference paragraphs 1 through 58 of the Complaint as if fully set forth herein.

60. In order to obtain Ogilvy's signature on the SLA, Tiger intentionally failed to disclose, and took active steps to conceal, TTI's non-compliance with its Periodic Reporting Obligations.

61. Tiger knowingly failed to disclose TTI's non-compliance with its Periodic Reporting Obligations—and TTI knowingly filed false statements with the SEC in April and May 2004 stating that it was in fact compliant with those requirements—because Tiger knew that Ogilvy would not execute the SLA if Ogilvy was aware that TTI was in default of those Exchange Act requirements.

62. Tiger also made a knowingly false statement of present fact by warranting in the SLA that "no consent, approval, authorization or order of, or qualification or filing with, any governmental body or agency is required for the performance by [TTI] of its obligations under the [SLA]." Tiger knew that statement was false when made because, at the time Tiger executed the SLA, it was aware that TTI had to file numerous reports with the SEC in order for TTI to have the ability to file the Registration Statement and make it effective for the duration of the SLA Term.

63. Ogilvy reasonably and justifiably relied on Tiger's representation that no further action was necessary for TTI to file the Registration Statement and make it effective for the duration of the SLA Term.

64. By virtue of the foregoing conduct, Tiger has committed common law fraud against Ogilvy.

65. As a proximate result of Tiger's fraudulent acts, Ogilvy has suffered substantial injuries in an amount to be determined at trial, but not less than $4.2 million plus interest, *i.e.* the approximate amount by which Tiger was in default to Ogilvy at the end of the SLA Term, which money Ogilvy was unable to recover due to Tiger's fraud.

## THIRD CLAIM

### SECURITIES FRAUD IN VIOLATION OF EXCHANGE ACT SECTION 10(B) & RULE 10B-5 PROMULGATED THEREUNDER

66. Ogilvy hereby realleges and incorporates by reference paragraphs 1 through 65 of the Complaint as if fully set forth herein.

67. Tiger's pledge of stock to Ogilvy constituted a sale of securities under Exchange Act Section 10(b) and Rule 10b-5 promulgated thereunder.

68. Tiger at all relevant times failed to disclose either TTI's non-compliance with its Periodic Reporting Obligations or its false statements to the SEC during 2004 that TTI had in fact fulfilled those obligations.

69. As alleged in more detail *supra*, Tiger falsely represented that no further action was necessary in order for TTI to file the Registration Statement and make it effective during the SLA Term.

70. In executing the SLA, Ogilvy reasonably relied on TTI's compliance with its Periodic Reporting Obligations and Tiger's representation that no further government filing was necessary in order to file the Registration Statement and make it effective during the SLA Term.

71. During the negotiations of the SLA, and in executing the SLA, Tiger engaged in acts that operated a fraud on Ogilvy, through the use of instrumentalities of interstate commerce: (i) by failing to disclose TTI's non-compliance with its Periodic Reporting Obligations; and (ii) by misrepresenting Tiger's ability to make the Registration Statement effective.

72. As a proximate result of Tiger's fraudulent acts, Ogilvy has suffered substantial injuries in an amount to be determined at trial, but not less than $4.2 million plus interest, *i.e.* the approximate amount by which Tiger was in default to Ogilvy at the end of the SLA Term, which money Ogilvy was unable to recover due to Tiger's fraud.

WHEREFORE, Ogilvy demands judgment against Tiger as follows:

A. A judgment on all counts against Tiger in an amount not less than $4.2 million, plus consequential damages and interest;

    B.    For such other and further relief as may be just and proper, together with consequential damages, and interest.

Dated:    New York, New York
October 3, 2005

DAVIS & GILBERT LLP

By: _____
Howard J. Rubin (HR 1768)
Scott L. Walker (SW 0330)
1740 Broadway
New York, NY 10019
(212) 468-4800

Attorneys for Plaintiff
Ogilvy Group Sweden AB